IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge S. Kato Crews

Criminal Action No. 1:24-cr-00238-SKC

UNITED STATES OF AMERICA,

    Plaintiff,

v.

DAYVON VAUGHNS,

    Defendant.

---

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE AND STATEMENTS (DKT. 17)

---

Mr. Vaughns was indicted by a grand jury on one count of possession of a firearm/ammunition by a prohibited person in violation of 18 U.S.C. § 922(g)(1). Officers discovered the firearm for which Mr. Vaughn is charged during a traffic stop and frisk of Mr. Vaughn, who was the passenger in the vehicle.

Mr. Vaughns' Motion to Suppress Evidence and Statements (Dkt. 17) deriving from the traffic stop and frisk and his corresponding arrest is now before the Court. The Court has viewed the body-worn camera (BWC) footage from Officers Russell and Grenfell, and Sergeant Jorge, referenced as exhibits to the Motion and submitted to the Court conventionally. Based on the Court's review of these and the related exhibit attachments submitted by the parties, the Court does not find an evidentiary hearing

1

is necessary. *United States v. Chavez-Marquez*, 66 F.3d 259, 261 (10th Cir. 1995) (evidentiary hearing not required when defendant fails to present sufficient facts justifying relief; evidentiary hearing is warranted when defendant raises factual allegations that are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in issue).

## FACTS[1]

On April 5, 2024, at approximately 10:00 a.m., Denver Police Officers Grenfell and Russell patrolled near a liquor store in West Denver. From their experience, they knew this to be a high crime area and a known open-air drug market. The Officers observed a red Jaguar parked in the liquor store parking lot with two men inside. The front-seat passenger, later identified as Mr. Vaughns, was wearing blue latex gloves. The Officers thought this suspicious and suggestive of possible narcotics dealing based on their training and experience.

The Officers followed the Jaguar as it exited the parking lot and trailed it down North Federal Boulevard to eastbound West Colfax Avenue. They suspected the Jaguar exceeded the speed limit, and at some point, they observed it fail to use a

---

[1] The facts are taken from the statement of facts in Defendant's Motion and includes the Court's findings based on its review of the BWC footage of the three involved Officers and the police reports attached to the Motion and the Government's responsive pleading. *See, e.g., United States v. Sanchez*, 555 F.3d 910, 922 (10th Cir. 2009) ("[T]he law is clear that hearsay evidence is admissible at suppression hearings.").

2

blinker when changing lanes. The Officers pulled alongside the Jaguar at a red light. After the light turned green, the Jaguar slowed its speed in relation to other traffic and in a manner that the Officers believed was suggestive of a driver trying to create space between them and law enforcement.

The Officers subsequently affected a traffic stop. Officer Russell told the driver that he had been "driving a little quick" and he didn't use his signal back when he was on Colfax when he moved from the right lane to the middle lane. The driver briefly disputed the latter.

While Officer Russell addressed the driver, Officer Grenfell contacted Mr. Vaughns who was seated in the passenger seat with the window down. Officer Grenfell observed that Mr. Vaughns was not wearing a seatbelt, and he could see an open alcohol container (shooter bottle) on the floorboard by Mr. Vaughns' feet. As Officer Grenfell stood outside Mr. Vaughns' window, Mr. Vaughns did not acknowledge Officer Grenfell but instead looked down as he manipulated his phone holding it in his lap. Officer Grenfell then commented that Mr. Vaughns was not wearing his seatbelt. Officer Grenfell then asked Mr. Vaughns for his ID, which Mr. Vaughns did not have with him. He then asked Mr. Vaughns for his name, which Mr. Vaughns provided. When Officer Grenfell next asked for Mr. Vaughns' date of birth, Mr. Vaughns responded that he was not the driver. Officer Grenfell then explained to Mr. Vaughns' that it was illegal for him not to wear his seatbelt, and Mr. Vaughns then provided his date of birth.

Officer Grenfell also asked Mr. Vaughns why he was wearing latex gloves, and Mr. Vaughns responded it was because he didn't like touching things with his hands, but he then immediately removed the gloves. After sitting with his hands palms down and crossed in his lap, Mr. Vaughns looked back down at his phone. His hands remained crossed with the phone in his right hand resting on his left hand, which remained palm down in his lap. As he did so, Officer Grenfell observed that Mr. Vaughns kept his hands down near his waistline holding his phone there for the duration of their contact.[2]

Based on his training, education, and experience, Officer Grenfell knew that (1) persons who state they don't have their ID are often trying to hide their identity from law enforcement; (2) passengers in vehicle stops that become defensive about being identified are often trying to divert law enforcement attention away from themselves to hide their involvement in a crime; (3) people who hold their hands or other objects over their waist area during vehicle stops are often trying to conceal contraband, usually weapons, by putting objects in between the contraband and law enforcement; and (4) while people naturally become nervous during vehicle stops, Mr. Vaughns' severe shaking in his hands made Officer Grenfell fear he was concealing a weapon and hoping not to get caught. Dkt. 17-5, ECF pp.3-4.

---

[2] Officer Grenfell also reported that Mr. Vaughns' hands were visibly shaking, but this is not clear from the BWC.

For these reasons, Officer Grenfell asked Mr. Vaughns to exit the vehicle because he intended to frisk him for weapons. When Mr. Vaughns exited with his phone in his hands, Officer Grenfell asked him to put his phone down on the passenger seat. Mr. Vaughns turned around to do so, and Officer Grenfell believed Mr. Vaughns reached his hands in front of him toward his waist area. Review of Officer Russell's BWC corroborates that Mr. Vaughns placed both of his hands on the front of his waistband as he turned his back to Officer Grenfell. So, Officer Grenfell grabbed Mr. Vaughns arms to prevent him from reaching a possible weapon. At that point Mr. Vaughns became verbally non-compliant, challenged Officer Grenfell's attempt to pat him down, and then resisted by trying to pull himself away from Officer Grenfell.

After a struggle that included Mr. Vaughns falling to the ground and both Officers Grenfell and Russell attempting to roll him to his stomach to be handcuffed, Officer Grenfell was able to pull a Glock 23 semi-automatic handgun from Mr. Vaughn's pants. There was one live .40 caliber cartridge in the gun's chamber.

Later, after Mr. Vaughns was under arrest and subsequently handcuffed and detained in the back of a police vehicle, Sergeant Jorge questioned Mr. Vaughns about his encounter with the Officers. He did not read Mr. Vaughns his *Miranda* rights before questioning him. He instead explained he was investigating the conduct of his Officers vis-à-vis their treatment of Mr. Vaughns. Mr. Vaughns proceeded to converse with Sergeant Jorge and answer his questions. In relevant part, their dialogue

included the following questions asked by Sergeant Jorge: (1) "Can you tell me what exactly happened from when they stopped you guys to right now?" (Dkt. 17-4 at approx. 3:20); (2) "What happened with you when they came in contact and talked to you? (*id.* at approx. 3:56); (3) "What happened after you got out of the car?" (*id.* at approx. 4:57); "And then what happened once you were out of the car?" (*id.* at approx. 5:20); and (4) "You just said something I can't ignore; you said [the officer] asked you for your gat[3]. What does that mean?" (*id.* at 6:14).

## ANALYSIS

The Motion seeks to suppress the firearm and Mr. Vaughns' statements to Sergeant Jorge. It argues: (1) the initial traffic stop was unconstitutional because the Officers lacked reasonable suspicion; (2) Officer Grenfell lacked reasonable suspicion to frisk Mr. Vaughns; and (3) Sergeant Jorge's un-*Mirandized* custodial interrogation of Mr. Vaughns was unconstitutional.

### 1.    **The Traffic Stop**

A traffic stop, however brief, constitutes a seizure under the Fourth Amendment and is only constitutional when "reasonable." *See, e.g., Delaware v. Prouse*, 440 U.S. 648, 653 (1979). A traffic stop is valid if based on an observed traffic violation or if the officer has an articulable, reasonable suspicion that a traffic violation has occurred or is occurring. *United States v. Callarman*, 273 F.3d 1284,

---

[3] A "gat" is a gun. *See* Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/gat (last accessed 01/02/25).

1286 (10th Cir. 2001). The constitutionality of a traffic stop does not depend on the actual motivations of the individual officers involved so long as there is probable cause or reasonable suspicion to believe the driver violated the traffic code. *Whren v. U.S.*, 517 U.S. 806, 812-13 (1996). Passengers have standing to challenge the lawfulness of their detention during a traffic stop. *Brendlin v. California*, 551 U.S. 249, 257-58 (2007).

"When faced with a motion to suppress evidence obtained as an incident to a traffic stop, the Government must present evidence to show that the traffic stop was justified by a reasonable, articulable suspicion of illegal activity." *United States v. Alvarez-Becerra*, 33 F. App'x 403, 406 (10th Cir. 2002). Proof of "'the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.'" *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

The Government has met its burden. The Officers suspected the vehicle was speeding based on its higher rate of speed in relation to the Officers' speed, and they observed the vehicle fail to signal while changing lanes, either of which are traffic violations. It is of no moment, for purposes of this Motion, that the driver may have denied he failed to use his turn signal. Officers Grenfell and Russell both indicate they observed the driver fail to use his signal when switching lanes, and they each had reasonable suspicion the vehicle was speeding when comparing the speed of their own vehicle to that of the vehicle in which Mr. Vaughns was a passenger. On these

7

facts the Court finds the traffic stop was reasonable. There is nothing in the evidence currently before the Court to suggest the Officers' actions were in derogation of a normal traffic stop regardless of their subjective motivations. *Whren*, 517 U.S. at 812-13.

Mr. Vaughns' argument applies a standard that isn't applicable here. He argues that "[i]f the government cannot prove the failure to signal, this Court should find the initial stop and the subsequent pat-down and arrest of Mr. Vaughns unreasonable as the fruit of that illegality." Dkt. 17, p.5. But, as noted above, the burden on the Government is to present evidence to show that the traffic stop was justified by a reasonable, articulable suspicion of illegal activity, which is less than the showing required for probable cause and shorter still of a preponderance of the evidence standard. The standard Mr. Vaughns asks this Court to apply is higher than what the law requires. The Government has met the applicable burden.

**2.   The Frisk**

Having lawfully stopped the vehicle for a traffic violation(s), the Officers were entitled to "take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, (1985). The Supreme Court has held that for the duration of a lawful traffic stop, officers effectively seize everyone in the vehicle—the driver and all passengers. *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). To conduct a pat-down of any of these individuals, "[t]he police need not have, in addition [to the traffic

8

violation], cause to believe any occupant of the vehicle is involved in criminal activity. To justify a patdown of the driver or a passenger during a traffic stop, however . . . the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Id.* at 327 and 331. Courts must look at the "totality of the circumstances" to determine whether the detaining officer had a "particularized and objective basis" for suspecting illegal activity. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

The totality of the circumstances here starts with the Officers first observing the Jaguar in a high crime area known to them for crimes involving weapons and narcotics. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."). The Officers knew that drug dealers would drive and loiter in the specific area where they saw the Jaguar parked, they saw Mr. Vaughns and the driver talking to people who were standing around the Jaguar, and they noticed Mr. Vaughns wearing blue latex gloves, which they knew to be commonly worn by drug dealers. The Officers then observed the Jaguar drive in ways that, in their experience, were consistent with trying to distance a vehicle from law enforcement.

Once stopped, Officer Grenfell believed Mr. Vaughns was trying to avoid being identified, he appeared nervous, and he held his phone over his waistband in a manner that in Officer Grenfell's experience was indicative of a person trying to hide

9

a firearm in their waistband. Once Mr. Vaughns exited the vehicle and turned his back to Officer Grenfell, Mr. Vaughns placed his hands on the front of his waistband. Officer Grenfell grabbed Mr. Vaughns' arms to prevent him from reaching a possible weapon. *Terry v. Ohio*, 392 U.S. 1, 27 (1968) ("The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."). When he did so, Mr. Vaughns became verbally non-compliant, challenged Officer Grenfell's attempt to pat him down, and resisted by trying to pull himself away from Officer Grenfell. Once subdued, the Officers located the firearm from Mr. Vaughns' waistband.

The Court finds the totality of the circumstances known to Officer Grenfell, including the high-risk scenario of a traffic stop, justified his attempted pat-down of Mr. Vaughns and was sufficient to support a reasonable suspicion that Mr. Vaughns was armed and dangerous. The Court watched both Officer Grenfell's and Russell's BWC and finds the footage materially corroborates the written police reports describing their traffic-stop encounter with Mr. Vaughns, and further supports Officer Grenfell's reasonable suspicion supporting the pat-down.

### 3.    The Custodial Interview

The Supreme Court in *Miranda v. Arizona* found that "the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work . . . to compel him to speak where he would not otherwise do so

10

freely." 384 U.S. 436, 467 (1966). The Fifth Amendment, therefore, requires that law enforcement give a suspect four specific warnings before a custodial interview: "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires." *Id.* at 479. Interrogation includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980). Custody is determined by whether a reasonable person would feel they were not free to leave. *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011).

Here, Mr. Vaughns was handcuffed, seated in the back of a police cruiser, and told he was going to jail at the time Sergeant Jorge questioned him. The Government does not appear to contest that Mr. Vaughns was in custody at the time, and the Court finds he was. What the Government claims is that Mr. Vaughns was not subjected to a custodial interview because Sergeant Jorge told Mr. Vaughns he was investigating *his Officers'* conduct, not Mr. Vaughns'. The Government further argues that Mr. Vaughns does not identify any incriminating statements made during the interview that he seeks to suppress, and the interview consists of self-serving statements that are likely inadmissible at trial under the rules of evidence. While the Court agrees with the latter two points, addressing the former point is warranted.

It's a fine line between a police sergeant's questioning of a 20-year-old suspect who is in custody about his Officers' conduct, and questioning that suspect about his own conduct, thus risking eliciting an incriminating response. Case in point, without *Mirandizing* his custodial interview with Mr. Vaughns, Sergeant Jorge asked Mr. Vaughns the following open-ended questions:

- "Can you tell me what exactly happened from when they stopped you guys to right now?"
- "What happened with you when they came in contact and talked to you?"
- "What happened after you got out of the car?"
- "And then what happened once you were out of the car?"
- "You just said something I can't ignore; you said [the officer] asked you for your gat. What does that mean?"

Dkt. 17-4 at approx. 3:20, 3:56, 4:57, 5:20, and 6:14, respectively. The open-endedness of these questions risks eliciting statements from Mr. Vaughns about his own conduct or state of mind. The questions are virtually indistinguishable in terms of any focus on the Officers' conduct versus Mr. Vaughns'. And the questions are particularly troubling when considering Mr. Vaughns' young age. The Court finds that any reasonable officer in Sergeant Jorge's position should know that his extremely open-ended questions to Mr. Vaughns were reasonably likely to elicit incriminating responses. *Rhode Island*, 446 U.S. at 300-301.

For these reasons, to the extent Mr. Vaughns made any incriminating statements during the custodial interview that the Government would seek to introduce at trial, the Court grants the Motion and suppresses those statements as obtained in violation of Mr. Vaughns' Fifth Amendment rights.

\*   \*   \*

For the reasons shared above, the Motion to Suppress Evidence and Statements is DENIED insofar as it seeks suppression of the firearm and GRANTED insofar as it seeks suppression of Mr. Vaughn's custodial statements.

DATED: January 3, 2025

BY THE COURT:

S. Kato Crews
United States District Judge